IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

KATHY D. SMITH,
      Plaintiff,

vs.                                                                    Case No. 5:04cv231/LAC/EMT

JO  ANNE  B.  BARNHART,
Commissioner of the
Social Security Administration,
Defendant.

_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits under Title II of the Act.

I.      PROCEDURAL HISTORY

      Plaintiff filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*., alleging an onset of disability on September 10, 1995 (Tr. 42-44).[1]  Plaintiff's application was denied initially and on reconsideration (Tr. 30-32, 35-37). A hearing was held before an Administrative Law Judge ("ALJ") on August 3, 2000, at which Plaintiff was represented by counsel and testified (Tr. 251-74).  On July 3, 2001, the ALJ rendered

_____

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on June 10, 2004 (Doc. 6).

a decision finding that Plaintiff was not under a "disability" as defined in the Social Security Act (Tr. 159-73).

The Appeals Council of the Social Security Administration ("Appeals Council") granted Plaintiff's request to review the ALJ's decision and, on February 3, 2003, remanded the case to the ALJ (Tr. 192-94).  According to the Appeals Council's order, Plaintiff had informed the ALJ that two of the medical records in her Social Security file prepared by Dr. Michael Rohan did not pertain to her, but to someone else (Tr. 193).  The ALJ agreed to remove the records from the file, but failed to do so, and instead relied on Dr. Rohan's opinion in finding that Plaintiff had the residual functional capacity ("RFC") to do light work (*id.*).  The Appeals Council ordered the ALJ to obtain updated medical records and evidence from a vocational expert as necessary and to provide discussion and rationale for the conclusions reached regarding the specific limitations resulting from Plaintiff's impairments (Tr. 194).

A second hearing was held before the ALJ on August 5, 2003, at which Plaintiff was represented by counsel and testified (Tr. 275-97).  A vocational expert (VE), Fred Schrieber, appeared but did not testify (*id.*).  On December 16, 2003, the ALJ rendered a decision in which he found that Plaintiff was not under a "disability" as defined by the Act (Tr. 19-27).  On July 8, 2004, the Appeals Council denied Plaintiff's request for review (Tr. 6-8).  The Appeals Council's action made the ALJ's decision the final decision of the Commissioner, and therefore subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.    FINDINGS OF THE ALJ

On December 16, 2003, the ALJ made several findings relative to the issues raised in this appeal (Tr. 26-27).  The ALJ found that: 1) Plaintiff meets the nondisability requirements for a period of disability and DIB set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2000;[2] (2) Plaintiff has not engaged in substantial gainful activity since her alleged onset date; (3) on or prior to December 31, 2000, Plaintiff had an impairment or

---

[2]Thus, the time frame relevant to this appeal is September 10, 1995 (alleged onset) to December 31, 2000 (date last insured).

combination of impairments that were "severe,"  but did not meet or medically equal one of the listed impairments in Appendix I, Subpart P, Regulation No. 4; (4) Plaintiff's allegations regarding her limitations are not totally credible; (5) [the ALJ] carefully considered all of the medical opinions in the record regarding the severity of Plaintiff's impairments; (6) on or prior to December 31, 2000, Plaintiff had the RFC to perform light work; (7) Plaintiff's past relevant work did not require the performance of work-related activities precluded by her RFC; (8) Plaintiff's medically determinable impairments did not prevent her from performing her past relevant work on or prior to December 31, 2000; and (9) Plaintiff was not under a "disability" as defined by the Social Security Act at any time through the date of the decision (Tr. 26).

III.    STANDARD OF REVIEW

        Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir.1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the

Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps. The steps are:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d

1007, 1011 (11th Cir. 1987).

IV.  PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A. Personal History

Plaintiff testified at the first ALJ hearing, on August 3, 2000, as follows.  She was forty-seven years old and had an eighth grade education (Tr. 258).   She previously worked as a convenience store cashier, a maid, and a radio coil wire packer (*id.*).  She held the wire packing job for approximately six months (Tr. 260).  The job required her to pack wires the size of a quarter into plastic crates (Tr. 259).  She was also required to use foot controls to operate an electric cutter (*id.*).  It was an eight-hour per day job and she sat while doing it (259-60).  Plaintiff testified that she was not currently able to work as a wire packer because she was unable to sit very long (Tr. 260-61).  She also stated she was unable to work as a cashier or a maid because those jobs required bending and lifting heavy items (Tr. 261).

Plaintiff testified that she had back surgery in October 1993 and again in September 1995 for herniated disks (*id.*).  Following the second surgery, Plaintiff worked for two days in April 1998 at Audio Telecom selling credit cards over the phone (Tr. 262).  She was fired after the second day because "[a]]fter sitting a little while [she] had asked to be excused" (*id.*).  Subsequently, she worked five or six days in the deli at Dixie Dandy, but had to see Dr. Reed after the fifth day because she thought she had pulled something due to the amount of bending and heavy lifting (fifteen to twenty pounds) required by the job (*id.*).  She also had difficulty with the amount of standing required (Tr. 263).  She indicated that she needs to be able to alternate sitting and standing positions (*id.*).

Over the previous several years, Plaintiff saw Dr. Reed, her surgeon, and Dr. Khan,[3] her family doctor (*id.*).  Since May 1999, Plaintiff's tail bone has been hurting, her hip pain has worsened, and she has arthritis in her left hand, arm, and shoulder (Tr. 264).  Plaintiff had the symptoms in her left arm and shoulder for six or eight months before she went to the doctor (Tr. 265).  She was not injured, she just started hurting and was unable to open bottles (*id.*).  Dr. Khan diagnosed Plaintiff with arthritis and treated her with cortisone injections in her shoulder (*id.*).  Plaintiff's hip problem has existed for a couple years, but seems worse lately (Tr. 265-66).

---

[3]The hearing transcript refers to "Dr. Conn"; however, from the medical records it appears that the proper spelling is "Dr. Khan" (*see* Tr. 151).

Previously, Dr. Reed gave her cortisone injections in her hip (Tr. 265).  She has trouble doing much activity due to her hip (Tr. 266).  At home she will "do a little bit" then recline in her recliner for thirty or forty minutes (*id.*).  She tries to get exercise by walking ten minutes in the morning and ten minutes in the evening (*id.*).  If she walks twenty minutes at one time, her hip "catches" (*id.*).

Plaintiff's tail bone also causes her problems with sitting (*id.*).  She can sit in a reclining position for about thirty minutes before she has pain (Tr. 267).  However, when she sits straight up, she experiences pressure in her back and tail bone immediately (*id.*).  During an average day, Plaintiff does activity for ten or fifteen minutes, then reclines for thirty or forty minutes for pain relief (*id.*).  At night, she gets up and down because she has low back pain if she lays in bed (Tr. 268).  Plaintiff's husband does most of the housework, but her sister also helps at times (*id.*).  Plaintiff cannot vacuum and cannot lift more than five pounds without experiencing pressure and pain in her back (*id.*).  She has more difficulty lifting with her left hand and cannot open things with that hand (Tr. 269).  She can put laundry in the washer, but her husband moves it to the dryer and takes it out (Tr. 268).  She cannot go shopping without assistance (*id.*).

At the time of the first hearing, Plaintiff was taking Ultram for pain and Flexeril occasionally for muscle spasm (Tr. 269).  She had also been taking Celebrex, but her doctor recently switched her to Vioxx (*id.*).  She has experienced no side effects from her medications (*id.*).

Plaintiff also testified that some of the medical records contained in her Social Security file were not her records (Tr. 254-55).  The records were prepared by Dr. Michael Rohan and pertained to a Kathy Smith with a different date of birth who had fractured her tail bone in 1999 (Tr. 255).  Plaintiff testified that she had seen Dr. Rohan in 1992 or 1993, but not in 1999, and that she had never fractured her tail bone (*id.*).

After remand by the Appeals Council, Plaintiff had a second ALJ hearing, on August 5, 2003, and testified as follows.  Plaintiff was fifty-one years old at the time of the hearing and had not worked since before the previous hearing in August 2000 (Tr. 278-79). She quit working because her "back hurt too bad" (Tr. 279).  Prior to quitting work, Plaintiff had two back surgeries, the second of which occurred in September 1995 (*id.*).  According to Plaintiff, the second back surgery did not decrease her pain (Tr. 280).  From 1995 until 1999, Dr. Reed treated Plaintiff with medication and informed her than he would need to do a third back surgery if she did not improve

(Tr. 279-80).  As of December 2000, Plaintiff could lift no more than five pounds and had trouble sitting or standing for any length of time (Tr. 285-89).

      B. Relevant Medical History

      Plaintiff first complained of back pain to her family practitioner, Misal Khan, M.D., on July 3, 1985 (Tr. 123).  Dr. Khan's impression was a back sprain, and he prescribed Robaxin, a muscle relaxer (*id.*).  Plaintiff returned with continued complaints of low back pain on July 15, 1985, and Dr. Khan prescribed additional Robaxin (Tr. 122).

      On September 15, 1993, Plaintiff underwent a CT scan, which showed an acentric disk herniation at L5-S1 to the left (Tr. 147).  A subsequent MRI showed a left central disk herniation of L5-S1 with impingement of the S1 nerve root (Tr. 146).  On October 14, 1993, Michael Reed, M.D., performed a laminotomy and diskectomy of L5-S1 (Tr. 89-97).  Plaintiff did well postoperatively and was discharged in good condition on October 17, 1993, with instructions restricting her from bending, lifting, and stooping (Tr. 89).

      Plaintiff continued to do well throughout the remainder of 1993 and was released to return to work in December 1993 (Tr. 144-45).  On February 14, 1994, Dr. Reed reported that Plaintiff had reached maximum medical improvement (Tr. 144).  Plaintiff had occasional low back pain throughout early 1994, but was doing well overall (Tr. 143-44).  On May 11, 1994, Plaintiff complained of occasional sacroiliac (SI) joint pain, which was mildly tender on palpation (Tr. 143).  Dr. Reed injected her left SI joint at that visit (*id.*).  On July 27, 1994, Plaintiff complained of some low back pain and buttock pain, and Dr. Reed planned to re-image her lumbar spine if her symptoms increased (*id.*).  When she returned to Dr. Reed on September 21, 1994, she had undergone another MRI, which showed no evidence of recurrent disk herniation or stenosis (*id.*).  Overall, Dr. Reed felt she had improved (*id.*).

      On February 22, 1995, Plaintiff returned to Dr. Reed.  She complained of some low back tightness, but had no radicular symptoms, no tension signs on examination, and her x-rays showed no abnormality (Tr. 142-43).  When she was seen by Dr. Reed on May 3, 1995, Plaintiff complained of back pain and had a tight hamstring on examination (Tr. 142).  On July 17, 1995, Plaintiff reported significant back pain and occasional leg pain to Dr. Reed (*id.*).  She had difficulty sitting and, on examination, had a diminished range of motion as well as left hamstring tightness (*id.*).

Dr. Reed performed a fusion of L5-S1 with instrumentation and bone graft on September 12, 1995 (Tr. 98-108, 141). Plaintiff did well postoperatively and was discharged in good condition on September 16, 1995, with instructions to avoid bending, lifting, and stooping (Tr. 98). She returned to the clinic on September 25, 1995 for follow up (Tr. 141). Her staples were removed and steri-strips were placed on the surgical wound (*id.*). She was placed in a lumbosacral orthosis (brace) and instructed to return in one month (*id.*).

In early October, Plaintiff was prescribed Lortab, a narcotic analgesic, and Ultram, a non-narcotic analgesic (*id.*). She returned to Dr. Reed on October 25, 1995, and was "doing a little better" (*id.*). Review of her x-rays showed increasing consolidation of her fusion, but she was advised to continue use of the brace and return in six weeks (*id.*). Plaintiff was provided with a refill of Lortab in November and multiple refills of Ultram throughout December 1995 and January 1996 (*id.*).

On January 18, 1996, Plaintiff saw Dr. Reed and complained of some low back soreness, but not the pain she experienced preoperatively (Tr. 140). She was able to heel and toe walk without difficulty and had minimal soreness at the surgical site (*id.*). X-rays revealed increasing consolidation of her fusion and no evidence of loosening of the instrumentation (*id.*). Use of the brace was discontinued and she was instructed to begin a walking and home exercise program (*id.*).

Dr. Reed documented that Plaintiff was doing much better on February 27, 1996 (*id.*). Plaintiff reported occasional back soreness, but that she was much better than preoperatively (*id.*). She had some diminished range of motion, but no tension signs (*id.*). She was to participate in physical therapy for one month, then proceed with a functional capacities evaluation (*id.*). Plaintiff continued to obtain refills of Ultram in February and March of 1996 (*id.*). Plaintiff returned to Dr. Reed on March 27, 1996 (Tr. 139). She was status post physical therapy with significant improvement in her overall symptoms (*id.*). She complained of minimal back pain and no leg pain (*id.*).

On May 1, 1996, Dr. Reed noted that Plaintiff's functional capacity had been evaluated, and he placed her "at a light duty physical demand level" (*id.*). Plaintiff reported occasional back soreness, but no radicular symptoms or significant back pain (*id.*). Dr. Reed released Plaintiff to return to work within the restrictions of her functional capacity evaluation (*id.*). He also reviewed

flexibility exercises with her and recommended that she continue on a home exercise program (*id.*). Plaintiff was placed on Naprosyn, an anti-inflammatory, and was given refills of Ultram throughout the summer and fall of 1996 (*id.*).

Plaintiff returned to Dr. Reed on November 6, 1996 (Tr. 138).  She was doing about the same, with some back pain and a "catching" feeling on rotation (*id.*).  A review of the x-rays showed what appeared to be a solid fusion on the left side; however, Dr. Reed documented that there could be a possible lucency in the posterolateral fusion mass (*id.*).  Dr. Reed discussed Plaintiff's options with her, but Plaintiff stated that she was doing relatively well and would not consider an exploration of her fusion at that point (*id.*).  Plaintiff continued to obtain refills of Ultram through the winter of 1996 and spring of 1997 (Tr. 138).

Plaintiff was seen by Dr. Khan on April 28, 1997, who noted that Plaintiff had two lumbar surgeries and continued to have back pain (Tr. 119).

When Plaintiff was next seen by Dr. Reed on May 5, 1997, she reported mid-back pain and left trochanteric[4] pain (Tr. 137).  Dr. Reed noted that Plaintiff was tender over the greater trochanter and had diminished range of motion (*id.*).  She had minimal paraspinal spasm on the right and was neurologically intact (*id.*).  Dr. Reed performed an injection of the greater trochanter and gave Plaintiff a prescription for Flexeril (*id.*).  Plaintiff continued to obtain refills of Ultram through the summer of 1997 and was also prescribed Elavil, an antidepressant (*id.*).

On September 3, 1997, Plaintiff saw Dr. Khan and reported that she had pulled her back rolling out of bed (Tr. 119).  She complained of severe pain in her mid-back for eight days (*id.*).  On physical examination, Dr. Khan noted that Plaintiff had tenderness at L2-3 with muscle stiffness (*id.*).  Straight leg raise was positive at 80 degrees on the right and 70 degrees on the left (*id.*).  Dr. Khan prescribed Lortab and noted that Plaintiff's next appointment with Dr. Reed was scheduled for September 11, 1997.

Plaintiff returned to Dr. Reed on September 11, 1997 and reported that she had been doing relatively well (Tr. 136).  However, she stated that she pulled her back several days earlier and had pain in her mid-back and thoracolumbar area (*id.*).  Dr. Reed noted moderate spasm in the left

---

[4]The trochanters are points at which the hip and thigh muscles attach to the upper femur.  Trochanter, *available at* http://www.medterms.com/script/main/art.asp?articlekey=10448 (Last visited January 19, 2006).

paraspinal muscle and diminished range of motion (*id.*).  Plaintiff had no tension signs, and full motor strength was present (*id.*).  X-rays showed a solid fusion at the transitional segment with no other abnormalities (*id.*).  Plaintiff continued to obtain refills of Ultram, Elavil, and Naprosyn throughout the fall and winter of 1997 and the spring of 1998 (Tr. 135-36).

Dr. Reed diagnosed Plaintiff with recurrent left trochanteric bursitis[5] on February 2, 1998 (Tr. 135).  He also noted that she was having some trouble above her previous surgery site (*id.*).  Dr. Reed documented that Plaintiff was neurologically intact, had a full range of motion, and no tension signs (*id.*).  He performed a trochanteric injection and provided Plaintiff with a prescription for a lumbosacral corset (*id.*).

On May 28, 1998, Plaintiff saw Dr. Khan with complaints of neck pain for four days (Tr. 118).  He noted that she previously had back surgery and was disabled since October 1995 due to back problems (*id.)*.  On physical examination, Dr. Khan noted mild tenderness at C6-7 with slight paraspinal tenderness and a lumbar surgical scar with mild tenderness (*id.*).  Range of motion of her neck was painful but full, while range of motion of her lumbar spine was restricted in all directions (*id.*).  Plaintiff had tenderness at L4-5 and L5-S1 with muscle stiffness (*id.*).  Straight leg raise was painful at 80 degrees (*id.*).  Dr. Khan instructed Plaintiff to continue with her medications (*id.*).  Plaintiff continued to obtain refills of Ultram throughout the summer and fall of 1998 (Tr. 136).

Plaintiff returned to Dr. Reed on August 17, 1998 for a recurrence of left-sided trochanteric pain (Tr. 134).  Dr. Reed noted that Plaintiff had tight hamstrings, but no pain with range of motion of the hips (*id.*).  Plaintiff was able to heel and toe walk without difficulty (*id.*).  She had mild discomfort with range of motion in her lumbar spine and was acutely tender over the left greater trochanter (*id.*).  Review of x-rays showed no change in the position of her graft and instrumentation (*id.*).  Dr. Reed performed a trochanteric injection and instructed Plaintiff to return to the clinic as needed (*id.*).  Plaintiff continued to obtain refills of Ultram throughout the fall and winter of 1998 and also obtained one refill of Naprosyn in August 1998 (*id.*).

Plaintiff returned to Dr. Reed on February 11, 1999, complaining of left hip pain and left-sided low back pain that radiated down her left leg to mid-thigh (Tr. 113).  Plaintiff denied any

---

[5]Trochanteric, or hip, bursitis is pain and inflammation over the outside of the hip and thigh area. http://orthopedics.about.com/cs/hipsurgery/a/hipbursitis.htm

increased numbness, tingling, or weakness in the left leg and had no muscle spasms (*id.*).  On examination, Dr. Reed noted tenderness over the left trochanteric area and a negative straight leg raise on the left (*id.*).  There was no tenderness to palpation in the lower back, and Plaintiff was neurologically intact (*id.*).  Dr. Reed felt that Plaintiff's low back pain may be referred pain from her trochanteric bursitis (*id.*).  His assessment was left trochanteric bursitis and lumbar degenerative disk disease, and he again injected Plaintiff's left trochanteric bursa (*id.*).  On August 3, 1999, Plaintiff returned to Dr. Reed and reported that she had worked two weeks at a deli, which required bending and lifting, and had aggravated her back and hip symptoms (Tr. 112).  Plaintiff complained of some low back pain and left buttock pain into the lateral left hip and into the right hip to some extent (*id.*).  Dr. Reed noted that Plaintiff was mildly tender over her low lumbar spine area, left greater than right (*id.*).  He also documented bilateral trochanteric tenderness, which was greater on the left (*id.*).  Plaintiff had symmetrical reflexes, normal motor strength, full range of motion in her hips, and no tension signs (*id.*).  X-rays of her lumbar spine showed no change in the position of her graft or instrumentation (*id.*).  Dr. Reed's assessment was bilateral trochanteric bursitis and lumbar degenerative disk disease (*id.*).  He performed an injection of the left trochanteric bursa and instructed Plaintiff to continue back exercises and hamstring stretches (*id.*).  Dr. Reed also instructed Plaintiff that if the injection helped her left hip, she was to return in three to four weeks for a right hip injection (*id.*).  Plaintiff continued to obtain refills of Ultram throughout the fall and winter of 1999 and spring of 2000 (Tr. 112, 133).

Plaintiff was seen by Dr. Khan on April 11, 2000, with complaints of low back pain (Tr. 152).  On physical examination, she had tenderness at L5 (*id.*).  Dr. Khan provided a prescription for an Ultram refill (*id.*).

On May 9, 2000, Plaintiff was seen by Dr. Khan for complaints of left arm, low back, and neck pain (Tr. 151).  Plaintiff had mild tenderness of her cervical spine with left sided paraspinal tenderness (*id.*).  X-rays showed degenerative joint disease at C5-6 and C6-7 with anterior osteophytes (*id.*).  Dr. Khan's impression was degenerative joint disease of the cervical spine and he prescribed Celebrex (*id.*).  On the same day, Dr. Khan signed a form for Liberty National Life Insurance Company verifying that he had examined Plaintiff and found her to be totally disabled

within the definition provided on the form (Tr. 148).[6]

From July 2000 through June 2003, Plaintiff regularly returned to Dr. Khan with complaints of low back and hip pain and was treated with Vioxx, Lortab, and Ultram (Tr. 207-38).

C.   Other Information Within Plaintiff's Claim File

The record contains a Medical Summary Sheet dated December 15, 1999 and signed by an unknown physician (Tr. 115).   The listed diagnosis is contusion to coccyx and the impairment is noted to be severe, but not expected to last for more than twelve months (*id.*).   No functional limitation was expected (*id.*).   The physician noted that Plaintiff had fallen, hit her lower back, and contused her coccyx (*id.*).

A state agency physician completed a Physical RFC Assessment on April 6, 2000 (Tr. 125-32).   According to the physician, Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, and could stand, walk, or sit six hours in an eight-hour workday (Tr. 126).   Her ability to push and pull was unlimited (*id.*).   Plaintiff was occasionally able to climb, balance, stoop, kneel, crouch, and crawl secondary to back pain (Tr. 127).   No visual, manipulative, communicative, or environmental limitations were established (Tr. 128-29).   In support of these findings, the physician noted that Plaintiff was a forty-seven year old female who fell in May 1999, injuring her coccyx, and that a physical examination in October 1999 showed a negative bone scan, negative straight leg raise, normal sensory and motor function in her legs and feet, and an ability to return to light work (Tr. 126).   The physician also noted that Plaintiff stated she had no new injuries, hospitalizations, or referrals to other doctors since her prior filing[7] and that she was the same as before (Tr. 126-27).   The diagnosis was contusion to coccyx and the physician noted that pain was considered in the RFC (Tr. 127).

Kamel Elzawahry, M.D., performed a consultative examination of Plaintiff on June 8, 2000 (Tr. 149-50).   Plaintiff's chief complaints were back pain and leg pain, worse with movement and activity, as well as leg numbness (Tr. 149).   Dr. Elzawahry documented that Plaintiff described pain

---

[6] The form provides that persons are considered totally disabled when they are: 1) "prevented from engaging for compensation in any occupation or work which [they] are or become reasonably fitted by education, training, or experience, or 2) [they] have suffered the total and permanent loss of the sight of both eyes, the use of both hands or both feet, or the use of one hand and one foot" (Tr. 148).

[7] Plaintiff has previously filed for benefits (*see* Tr. 42).

Case No.: 5:04cv231/LAC/EMT

that was radicular in nature, radiating to both gluteal regions and to the lower extremities (*id.*). On physical examination, Plaintiff was pleasant and cooperative, but appeared to be in a great deal of distress (*id.*). Plaintiff's tandem walk, gait, station, and base were all normal (Tr. 150). Examination of the spine revealed marked tenderness over the scar of her previous surgery and limitation of movement of the spine to 80 percent of normal (*id.*). Forward bending and straight leg raise were positive at 45 degrees (*id.*). Dr. Elzawahry's diagnosis was failed laminectomy syndrome[8] with persistent low back pain with radicular symptomology (*id.*). He advised Plaintiff to continue with pain and anti-inflammatory medications (*id.*). He also advised her to use heat and hot showers, suggested that she may benefit from whirlpool treatment, and instructed her to return for follow up on an as needed basis (*id.*).

Dr. Elzawahry completed a physical capacities evaluation on November 28, 2000 (Tr. 155).[9] He opined that Plaintiff could sit, stand, and walk for half an hour at a time for a total of one hour each during an eight-hour workday (*id.*). Plaintiff could lift and carry up to five pounds frequently and up to ten pounds occasionally (*id.*). She could use her hands for repetitive actions, but could not use her feet for repetitive movements such as pushing or pulling leg controls (*id.*). Dr. Elzawahry reported that Plaintiff could occasionally perform postural activities (*id.*). He opined that she had no restriction from exposure to dust and fumes; a mild restriction from operating automotive equipment, working around moving machinery, or working at unprotected heights; and a moderate restriction from working in humid conditions (*id.*).

D.      Records Found in Plaintiff's Social Security Record that do not Pertain to Her

On July 2, 1999, a Kathy Smith with a birth date of December 17, 1956, was seen by Michael Rohan, M.D. (Tr. 111). She had fallen on her tail bone while working at a nursing home on May 3, 1999 and continued to have pain (*id.*). Dr. Rohan diagnosed her with a probable contusion and ordered a bone scan (*id.*). She followed up with Dr. Rohan four additional times (*id.*). On her last visit, her tail bone remained tender, but straight leg raise was negative, sensory and motor function

---

[8]Failed laminectomy syndrome refers to chronic pain that occurs after spinal surgery. Causes of Failed Back Surgery Syndrome, *available at* http://www.spine-health.com/topics/surg/scar/scar02.html (Last visited January 6, 2006).

[9]It appears from a letter written by Dr. Elzawahry that this evaluation was based on his June 2000 examination of Plaintiff (*see* Tr. 154).

were intact, and her bone scan was noted to be negative (*id.*).[10]

V.      DISCUSSION

Plaintiff contends the ALJ erred: 1) in determining Plaintiff's RFC by relying upon Dr. Reed's "outdated" opinion, and by relying upon the state agency nonexamining physician's opinion, because the nonexaminer's opinion was based upon records that pertain to a different Kathy Smith, and 2) in discrediting Dr. Elzawahry's opinion and in failing to update Dr. Reed's and Dr. Khan's assessments regarding Plaintiff's functional limitations (Doc. 8 at 1-2).

A.  RFC Determination

1.  Dr. Reed's 1996 medical opinion

Dr. Reed was Plaintiff's treating physician.  In May 1996 he opined that Plaintiff was capable of performing light work activity (Tr. 23, 139).  Plaintiff asserts that the ALJ "heavily relied" on this opinion "even though Dr. Reed's more recent progress notes indicate a clear deterioration" of Plaintiff's condition (Doc. 8 at 9).  Plaintiff further contends that the 1996 opinion failed to consider the effects of Plaintiff's later-diagnosed trochanteric bursitis and that Dr. Reed should have been recontacted to determine if his opinion remained the same in light of Plaintiff's new symptoms (Doc. 8 at 12).  The Commissioner contends that Plaintiff's condition was not deteriorating, and the bursitis did not greatly affect her physical capacities (Doc. 11 at 10-11).

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1440-1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d 580 (ALJ properly discounted treating physician's report where

---

[10]Plaintiff's date of birth is August 4, 1952 (*see* Tr. 52).  It has been established that these records do not pertain to her; they were to be stricken from the record and not considered.

the physician was unsure of the accuracy of his findings and statements).  Thus, the ALJ was required to give substantial weight to Dr. Reed's opinion absent good cause to do otherwise.

Although Dr. Reed's opinion was rendered in May 1996, the ALJ correctly noted that in November 1996 and May 1997, Dr. Reed observed that Plaintiff's x-rays "showed a solid fusion at L5-S1," and that at each visit Plaintiff was neurologically intact (Tr. 23, 137-38).  Further, the November 1996 record reflects Plaintiff's statement that "she is actually doing relatively well" and had no plans to return to Dr. Reed's office for six months (Tr. 138).  Additionally, the ALJ noted that Dr. Reed's opinion was not inconsistent with other substantial evidence in the record (Tr. 23-24).[11]

Moreover, as argued by the Commissioner, Dr. Reed's more recent treatment notes do not show a clear deterioration of Plaintiff's condition as suggested by Plaintiff.  In May and September 1997, Plaintiff had diminished range of motion (Tr. 136-37); however, she also had diminished range of motion in February 1996 (Tr. 140), *before* the opinion at issue was rendered.  Furthermore, in September 1997, Plaintiff again reported that she was doing "relatively well" (Tr. 136).  She had full motor strength, her x-rays continued to show a solid fusion, and no other abnormalities were present (Tr. 136).  Although Plaintiff presented with trochanteric bursitis in February 1998 and had some pain, she was neurologically intact, had full range of motion, and no tension signs were present (Tr. 135).  Dr. Reed's additional treatment records concern visits in August 1998, February 1999, and August 1999, which are discussed in detail, *supra*.  They do not document a deterioration of Plaintiff's condition.  Notably, during the August 1999 visit, the last visit before Plaintiff's insured status expired, Plaintiff had some pain, but no numbness, tingling, or weakness in her legs (Tr. 112).  She also had bilateral symmetrical reflexes, full range of motion of her hips, and full motor strength (described as "5/5 bilaterally") (*id.*).  The x-rays of her lumbar spine showed no change in the position of her graft or instrumentation, and no tension signs were present on examination (*id.*).  She was advised to continue back exercises and hamstring stretches (*id.*).

Thus, the records do not document a clear deterioration of Plaintiff's condition, and they do not provide any reason or "good cause" for the ALJ to discount Dr. Reed's earlier opinion, as that

---

[11]As will be discussed more fully below, Dr. Reed's opinion is inconsistent with some of the other evidence in the record, but the ALJ properly discredited the inconsistent evidence.

opinion is consistent with his more recent records.  Accordingly, the ALJ properly gave substantial weight to Dr. Reed's 1996 opinion.

Plaintiff further contends that the ALJ should have requested an updated opinion from Dr. Reed in light of Plaintiff's later-diagnosed condition, trochanteric bursitis.  The ALJ has a duty to fully and fairly develop the record.  Welch v. Bowen, 854 F.2d 436, 438 (11th Cir. 1988); Cowart v. Schweiker, 662 F.2d 731, 735-36 (11th Cir. 1981); Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See* Cowart, 662 F.2d at 735-36.  In Graham, however, the court held that the record did not "show the kind of gaps in the evidence necessary to demonstrate prejudice," and, therefore, a remand for further development of the record was not necessary.  129 F.3d at 1423.  Similarly, the record in this case is neither incomplete nor inadequate.  Dr. Reed's records cover most of the time frame relevant to Plaintiff's claim and adequately describe the effects of Plaintiff's bilateral trochanteric bursitis.  For example, the records show that in August 1998, Plaintiff reported left-sided trochanteric pain, but had no pain with range of motion of the hips and was able to heel and toe walk without difficulty (Tr. 134).  She was treated with an injection and advised to return "as needed" (*id.*).  She did not return to Dr. Reed until February 11, 1999, at which time she complained of hip pain, and was again treated with an injection and "tolerated the procedure well" (Tr. 113).  She was advised to follow up with Dr. Reed if her pain "persists or is exacerbated" (*id.*).  She did not return to Dr. Reed until August 3, 1999 (Tr. 112), suggesting that her hip pain did not persist or worsen and that the injections successfully treated her pain.  On August 3, 1999, Plaintiff did report some hip pain to Dr. Reed, but did not describe the pain as severe or extreme (*id.*).  Plaintiff simply reported "some" hip pain, as well as back and buttock pain, that apparently resulted from lifting and bending and not necessarily from her trochanteric bursitis (*see id.*).  Nevertheless, Plaintiff had no numbness, tingling, or weakness in her legs (Tr. 112).  She had full range of motion of the hips, was again treated with an injection, and was advised to continue back exercises and hamstring stretches (*id.*).  Accordingly, the record includes sufficient information upon which to base a decision and there was no need for the ALJ to obtain a more recent opinion from Dr. Reed based upon the trochanteric bursitis diagnosis.

2.   The state agency nonexamining physician's opinion

Plaintiff argues that the ALJ erred in relying on the state agency physician's opinion which was based, in part, on evidence stricken from the record (Doc. 8 at 12-13).  However, the decision in this case reveals that the ALJ undertook an independent analysis of the record as a whole including Plaintiff's testimony and records from Drs. Reed, Khan, and Elzawahry (Tr. 22-25).  After completing a thorough evaluation of the entire record, the ALJ determined that Plaintiff was able to perform light work activity (Tr. 23).  The ALJ did state that his RFC determination was consistent with that of the state agency physician, who relied upon information that was to be stricken from the record, but that is of no significance because the ALJ undertook an independent analysis of the record as a whole and, as discussed above, properly relied on Dr. Reed's opinion in determining Plaintiff's RFC (Tr. 23).  See 20 C.F.R. § 404.1545(a) (2005) (RFC is an assessment based upon all of the relevant evidence including a claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records).

     B.  Evidence Concerning Plaintiff's Functional Limitations

          1.  <u>Discrediting Dr. Elzawahry's opinion</u>

Plaintiff argues that the ALJ erred in discrediting Dr. Elzawahry's opinion (Doc. 8 at 14-17) that Plaintiff could sit, stand or walk for only one half hour continuously and for a total of only one hour each in an eight-hour workday; lift and carry up to five pounds frequently and up to ten pounds occasionally; and other physical restrictions as discussed *supra*.  The ALJ found that Dr. Elzawahry's opinion was inconsistent with Dr. Reed's opinion and was internally inconsistent (Tr. 24).  As the ALJ noted, Dr. Elzawahry examined Plaintiff only once (Tr. 24, 263).  Generally, a treating physician's medical opinion is entitled to greater weight than the opinion of a consulting physician.  *See* <u>Wilson v. Heckler</u>, 734 F.2d 513, 518 (11th Cir. 1984), but even a treating physician's opinion may be discounted when good cause exists.  Good cause exists where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding.  *See* <u>Schnorr v. Bowen</u>, 816 F.2d 578, 581 (11th Cir. 1987); <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 280-81 (11th Cir. 1987).  As the ALJ noted, Dr. Elzawahry's opinion was inconsistent with Dr. Reed's opinion, and Dr. Reed was a treating physician (Tr. 24).  Additionally, Dr. Elzawahry's physical examination revealed that Plaintiff's tandem walking, gait, station and base were normal, and that the movement of her spine was 80% of normal.  He recommended only conservative treatment (e.g., simple pain

medication, hot showers, possible whirlpool treatment), which was inconsistent with the severe restrictions he documented on the Physical Capacities Evaluation form he completed five months after his examination of Plaintiff (Tr. 149-50, 155).  His objective findings were also relatively mild when compared to his opinion regarding Plaintiff's abilities (*id.*).  Thus, the ALJ properly discounted Dr. Elzawahry's opinion as being internally inconsistent and inconsistent with the record as a whole.

2.  Failure to obtain an updated or revised assessment from Dr. Khan

At the outset, it should be noted that the ALJ properly discounted Dr. Khan's opinion of "total disability" because: 1)  it was based upon an insurance company's definition of disability, not the Social Security Administration's definition (*see* Tr. 148); 2) the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability (as stated in 20 C.F.R. § 404.1527(e)(1), the Commissioner is "responsible for making the determination or decision about whether [a claimant] meet[s] the statutory definition of disability . . . A statement by a medical source that [a claimant is] "disabled" or "unable to work" does not mean that [the Commissioner] will determine that [a claimant is] disabled"); and 3) the ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d at 583.

Plaintiff does not necessarily disagree that the opinion was properly discounted, but argues instead that Dr. Khan should have been asked to reassess Plaintiff's condition (*see* Doc. 8 at 14, 17-18).  The ALJ certainly had the option of doing so, but the ALJ was not required to do so.  As discussed above, the ALJ is required to further develop the record only if it shows "the kind of gaps in the evidence necessary to demonstrate prejudice," Graham, 129 F.3d at 1423, and, as noted *supra*, no such gaps exist in the instant case.

Moreover, the record reflects that Dr. Khan was Plaintiff's family practitioner[12] for many years (*see* Tr. 116-24, 151-52, 207-44).  Although his records are somewhat difficult to decipher, it appears that he treated Plaintiff for a variety of ailments including a growth on her lower abdomen (Tr. 119), vaginal bleeding (Tr. 120), ovarian cysts (Tr. 120), breast pain (Tr. 122), high blood pressure (Tr. 215, 217, 230), the flu (Tr. 218), headaches (Tr. 220), bladder pressure (Tr. 223), and

---

[12]Dr. Misal Khan is listed as a general practitioner in the American Medical Association's ("AMA") listing of physicians, available at http://www.ama-assn.org/ under "Doctor Finder."

heart palpitations (Tr. 230). Although Dr. Khan's records also reflect that Plaintiff reported back pain to him, for which he prescribed pain medication, Dr. Reed was the physician primarily responsible for the treatment of Plaintiff's back and hip conditions, and Dr. Reed is board certified in orthopedic surgery.[13]  Title 20 C.F.R. § 404.1527(d)(5) provides that "more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." Thus, Dr. Reed's opinion was entitled to more weight than Dr. Khan's, regardless of whether another opinion was obtained from Dr. Khan.

For the foregoing reasons, this court concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 23rd day of January 2006.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

---

[13]*See* AMA listing, as described above in footnote 12.

Case No.: 5:04cv231/LAC/EMT